1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7    E.S.,

                    Plaintiff,                    Case No.  19-cv-03228-JCS

8                                                 **ORDER GRANTING PLAINTIFF'S**
         v.                                       **MOTION FOR SUMMARY**
9                                                 **JUDGMENT, DENYING**
     ANDREW M. SAUL,                              **DEFENDANT'S MOTION FOR**
10                                                **SUMMARY JUDGMENT AND**
                    Defendant.                    **REMANDING FOR AWARD OF**
11                                                **BENEFITS**

12                                                Re: Dkt. Nos. 15, 20

13

14   **I.     INTRODUCTION**

15        Plaintiff E.S.[1] applied for disability insurance under Title II of the Social Security Act on

16   November 6, 2015, alleging that she was unable to work due to arthritis, back pain, sciatica, and a

17   right ankle injury starting January 18, 2013.  Administrative Record ("AR") at 66, 163–66.  She

18   subsequently amended her onset date to March 1, 2010.  *Id*. at 167.  She seeks review of the final

19   decision of Defendant Andrew Saul, Commissioner of the Social Security Administration

20   ("Commissioner") denying her application.  For the reasons stated below, the Court GRANTS

21   Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary

22   Judgment, REVERSES the decision of the Commissioner, and REMANDS the case to the Social

23   Security Administration for award of benefits.[2]

24

25

26   _____

     [1] Because opinions by the Court are more widely available than other filings and this Order
27   contains potentially sensitive medical information, this Order refers to Plaintiff using only her
     initials.
28   [2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
     U.S.C. § 636(c).

United States District Court
Northern District of California

## II.      BACKGROUND

### A.      Factual Background

#### 1.      Education and Employment

Plaintiff was born in1975 and completed high school in 1995.  AR at 92, 213.  Plaintiff worked as a postal clerk from 1996 to 2001, a file clerk at a non-profit in 2001, a retail salesclerk in 2001 and 2002, and a hotel housekeeper from 2004 to 2009.  *Id*. at 213, 296.  Plaintiff suffered a work-related injury in 2009 and, as a result, returned to work with limitations.  *Id*. at 41.  After two to three weeks on light duty, Plaintiff returned to her usual full housekeeping duties.  *Id*. at 608.  Plaintiff was laid off on November 27, 2009 due to economic conditions and not her workplace injury.  *Id*.

#### 2.      Medical History

On August 16, 2009, Plaintiff injured her right ankle while working as a hotel housekeeper.  *Id*. at 280.   Plaintiff was walking down stairs when she missed a step and twisted her ankle inward.  *Id*. at 339.  The following day, Robert Wagner, M.D., examined Plaintiff and diagnosed her with a sprained right ankle.  *Id*.  An x-ray found no evidence of fracture or dislocation.  *Id*. at 335.  Dr. Wagner provided Plaintiff with naproxen, banalg lotion, ankle support, a cane, and a hot and cold pack.  *Id*.  Dr. Wagner allowed Plaintiff to return to work for a sit-down job, limited her standing and walking to two hours per day, and directed her to wear ankle support and keep her ankle elevated.  *Id*.  Dr. Wagner prescribed Vicodin for Plaintiff's pain.  *Id*. at 321.  Plaintiff completed six sessions of physical therapy but on October 16, 2009, Dr. Wagner noted that Plaintiff's condition had not improved significantly.  *Id*. at 319–20.

Plaintiff was referred to Thomas Peatman, M.D., who provided an orthopedic surgery consultation on November 4, 2009.  *Id*. at 384.  By this time, Plaintiff had returned to full duty as a hotel housekeeper.  *Id*. at 385.  Following the consultation, Dr. Peatman did not recommend surgery.  *Id*. at 386.  Instead, Dr. Peatman recommended further physical therapy and potentially additional restrictions on Plaintiff's physical activities.  *Id*.  Plaintiff participated in seven additional sessions of physical therapy.  *Id*. at 388.   On December 15, 2009, an MRI revealed subtalar arthritis, peroneal tendonitis without tear, and an ATFL sprain.  *Id*. at 391.  Plaintiff began

United States District Court
Northern District of California

wearing a CAM walker boot in January 2010 to help her walk and began taking Iodine and Ultracet for pain relief. *Id*. In February 2010, Plaintiff was prescribed Voltaren gel—a topical NSAID—for pain relief. *Id*. at 393.

In March 2010, Plaintiff first reported pain in her right hip's SI joint to Dr. Peatman. *Id*. 395. During the same appointment, Dr. Peatman administered a steroid injection in her right ankle and prescribed a flector patch for her SI joint. *Id*. By April 2010, Plaintiff was weaned from the CAM walker boot; however, Plaintiff subsequently reported increased pain in her right ankle and right SI joint. *Id*. at 400. As a result, Dr. Peatman instructed Plaintiff to resume using the CAM walker boot. *Id*. at 401. Dr. Peatman also requested approval for eight additional physical therapy sessions. *Id*. The request was denied by workers' compensation. *Id*.

With Plaintiff's continued pain, Dr. Peatman requested approval for a PRP injection in June 2010. *Id*. at 407. In July 2010, the request for the PRP injection was denied and Dr. Peatman requested a second opinion from Jeffrey Mann, M.D. on potential surgical decompression. *Id*. 409–10. In September 2010, Plaintiff reported that her SI joint pain radiated down her leg and her leg became numb when she sat for extended periods. *Id*. 415. In October 2010, Plaintiff told Dr. Peatman of back pain that she believed was related to her ankle injury. *Id*. at 419.

On August 10, 2010, an agreed medical examination was performed by John Warbritton, III, M.D. *Id*. at 608, 628. Dr. Warbritton examined Plaintiff's lower back and noted no lumbar paraspinal muscle spasm and no tenderness near the lumbosacral junction, the sacroiliac joints bilaterally, or the sciatic notches bilaterally. *Id*. at 631. Dr. Warbritton noted one half inch of atrophy in each of Plaintiff's right thigh and calf and noted some limited range on motion in her right ankle. *Id*. at 632. After reviewing Plaintiff's records and medical imaging, Dr. Warbritton opined that Plaintiff likely "reached a point of maximal medical improvement" one year after her injury. *Id*. at 634. He concluded that Plaintiff's whole person was 10% impaired. *Id*. at 635.

In December 2010, Plaintiff first saw Dr. Mann, an orthopedic surgeon who specializes in foot and ankle surgery. *Id*. at 375. Following a second MRI of Plaintiff's right ankle in December 2010, Dr. Mann recommended surgical reconstruction of Plaintiff's right ankle lateral ligaments and removal of the os trigonum. *Id*. at 370. The MRI revealed subtalar joint arthritis with

osteophyte formation, an enlarged os trigonum, and tears of the lateral ankle ligaments.  *Id*.  Dr. Mann performed the recommended reconstruction surgery on Plaintiff in March 2011.  *Id*. at 367.  Plaintiff was prescribed Vicodin after the procedure.  *Id*. at 365.

Ten days after the surgery, Dr. Mann observed that Plaintiff was experiencing "moderate pain in the surgical area" but that her wound was healing well.  *Id*.  at 367.  He applied a "non-weight-bearing cast" at that visit.  *Id*.  A month later, in April 2011, Plaintiff was still experiencing "moderate pain in the surgical area."  *Id*. at 365.  At that point, he described Plaintiff's weight-bearing status as "partial" and noted that Plaintiff would soon be starting physical therapy.  *Id*. at 365. The following month, in May 2011, Dr. Mann noted that Plaintiff "continue[d] to experience moderate pain in the surgical area with walking more than ten minutes."  *Id*. at 363.  At that point, Dr. Mann described Plaintiff's weight-bearing status as "full weight-bearing in CAM walker."  *Id*.  He noted that Plaintiff had started physical therapy two weeks before.  *Id*.  A month later, Plaintiff "continue[d] to have moderate pain in the surgical area."  *Id*. at 361.  In July 2011, Plaintiff was still experiencing "moderate pain" and taking 2-3 Vicodin a day.  *Id*. at 359.   She received an injection of dexamethasone into the plantar fascia "due to pain."  *Id*.  She later reported to Dr. Mann that it helped for one month.  *Id*. at 353.  Plaintiff was still using a cane "most of the time" and her walking continued to be "very limited."  *Id*. at 359.   Dr. Mann noted at this visit that she had completed her physical therapy.  *Id*.

In September 2011, Plaintiff was still experiencing "moderate pain" under the heel, though the pain over her subtalar joint was described as "mild."  *Id*. at 357. Her walking was still "very limited" and she continued to use a cane "most of the time."  *Id*. at 357.  Dr. Mann's report in October 2011 was virtually the same.  *Id*. Dr. Mann noted that Plaintiff's "recurrent pain under her heel and especially over the lateral hindfoot, [was] only somewhat less than preoperatively."  *Id*. at 355.  He also opined that if Plaintiff's symptoms did not improve, Plaintiff's condition would likely be permanent and stationary.  *Id*. at 356.  Plaintiff received an injection of cortisone into the subtalar joint.  *Id*.at 356.

In November 2011, Plaintiff reported "difficulty with prolonged walking/standing," that she was using a cane "most of the time" and that her walking was "very limited"(no more than one

United States District Court
Northern District of California

4

block at a time). *Id*. at 353. Dr. Mann observed that Plaintiff "continue[d] to have moderate pain in the surgical area and under the plantar heel" and that she was taking 3-4 Vicodin for pain a day. *Id.* Dr. Mann again stated that Plaintiff's "recurrent pain" was "only somewhat less than preoperatively." *Id.* He recommended that Plaintiff be limited to sedentary work only. *Id.* at 354.

By February 2012, Dr. Mann had concluded that the reconstruction surgery had been unsuccessful, noting that Plaintiff "did not respond to lateral ligament reconstruction," and that she continued to experience "persistent pain from subtalar join arthritis." *Id*. at 352. He concluded therefore that Plaintiff was a "candidate for subtalar joint fusion." *Id.* In notes from Dr. Mann's last appointment with Plaintiff, in April 2012, Dr. Mann reiterated this conclusion and noted that Plaintiff was "interested in proceeding with surgery." *Id.* at 350. Dr. Mann also observed that Plaintiff's recent x-rays indicated that her subtalar joint had deteriorated since the previous x-rays performed six months earlier. *Id.* He noted that Plaintiff was experiencing mild pain under the heel, moderate pain over the subtalar joint, that Plaintiff used a cane "most of the time," that her walking continued to be "very limited" and that she was taking 3-4 Vicodin a day. *Id.* at 349.

In the months following Plaintiff's reconstruction surgery, Dr. Peatman also saw Plaintiff approximately monthly. *See id.* at 439-476. The first time he saw Plaintiff after her surgery, on March 16, 2011, Plaintiff was still in a cast, taking 6 Vicodin a day and complained of "moderate dull pain in her right ankle." *Id.* at 439-440. In the ensuing months, Dr. Peatman frequently observed that Plaintiff was experiencing "moderate" pain or worse. *See id*. at 441-442 (April 13, 2011 treatment note observing that Plaintiff was experiencing "moderate dull pain in her right ankle" and was taking 4 Vicodin a day); 443-444 (May 25, 2011 treatment notes stating the same); 447 (July 25, 2011 treatment notes observing that Plaintiff was experiencing "mild dull pain" in the right ankle but "moderate sharp pain" under the heel and that she was taking 4 Vicodin a day); 449 (August 19, 2011 treatment note stating that Plaintiff was experiencing "burning pain" at the 6-7 level "primarily at the bottom of the heel" down to a 5 with pain medication, and that she was taking 4-6 Vicodin a day); 452 (September 15, 2011 treatment note stating the same); 455 (October 3, 2011 treatment note describing "moderate to severe burning pain in the heel"); 458

(October 6, 2011 treatment note describing "persistent moderate to severe burning pain in the heel");  461 (December 5, 2011 treatment note describing "moderate to severe burning pain in the heel" and stating that Plaintiff was taking 4-6 Vicodin a day);  464 (January 11, 2012 treatment note describing "persistent moderate to severe burning pain in the heel" and stating that Plaintiff was taking 3-4 Vicodin a day);  473 (March 1, 2012 treatment note stating that Plaintiff was experiencing "persistent moderate to severe burning pain in the heel");  *see also id.* at 476 (January 26, 2012 report based on January 11, 2012 examination stating  that Plaintiff was experiencing "unrelenting moderate to severe right ankle pain").  On one occasion, in his June 29, 2011 treatment notes, Dr. Peatmen described Plaintiff's pain level as "mild to moderate," though he noted that she was still taking 4 Vicodin a day at that point.  *Id.* at 445.

Dr. Peatman initially opined that Plaintiff was "getting better" after her surgery.  *Id.* at 440 (March 11, 2011 treatment note); 442 (April 13, 2011 treatment note); 444 (May 25, 2011 treatment note).  As the months progressed, however, his opinion became more guarded, changing to the opinion that Plaintiff was "*slowly* getting better" in June 2011, *id.* at 446 448, 450, 453 (emphasis added), then to "she is slowly getting a *little bit* better" and "she is getting better very slowly" in October 2011.  *Id.* at 456, 459 (emphasis added).   Finally, in December 2011, Dr. Peatman's opinion changed to "She is not getting better."  *Id.* at 462   Almost a year later, his opinion had not changed.  *Id.*  at 497-498 (October 3, 2012 treatment note stating "She is not getting better.").

During this period, Dr. Peatman repeatedly observed that Plaintiff's ability to stand and walk or bear weight was limited due to her pain.  *See, e.g., id.* at 449 (August 19, 2011 treatment note stating that Plaintiff's pain got worse with walking or standing more than 15 minutes and that she used "ice and elevation" thirty minutes at a time 2-3 times a day for the pain);  458-459 (October 6, 2011 treatment note observing that Plaintiff's pain was "worse with prolonged standing and walking" and opining that Plaintiff could bear weight "for 10 minutes at a time alternating with 15 minutes of non-weight bearing activity.  Max 30 minutes weight bearing per hour" and that Plaintiff could not use stairs, walk for prolonged periods, or walk on uneven terrain); 452 (September 15, 2011 treatment note stating the same); 455-456 (October 3, 2011

treatment note stating the same).

In June 2012, Plaintiff first saw Lucille Andersen, M.D., an orthopedic surgeon, who observed that Plaintiff "still has pain and she has sharp pain as well as numbness." *Id*. at 482-484. She also noted that Plaintiff continued to take Vicodin. *Id*. at 482. Dr. Andersen provided Plaintiff with crutches on an urgent basis and ordered a third MRI of Plaintiff's right ankle. *Id*. at 483, 488. The MRI revealed "[t]hinning of [the] peroneus brevis and fluid in [the] peroneal sheath which is consistent with [a] longitudinal tear" and "[s]ubtalar impingement and fraying of [the] FHL tendon." *Id*. at 491. On August 7, 2012, Dr. Andersen stated that Plaintiff had "signs and symptoms consistent with right old navicular fracture, DJD at [the] talonavicular and subtalar joints with impingement present, symptomatic longitudinal tear or peroneus brevis, asymptomatic fraying of FHL tendon and neuritis." *Id*. Dr. Andersen recommended surgery to perform right triple arthrodesis, possible percutaneous tendon Achilles lengthening, peroneal exploration and repair, and versus longus to brevis transfer. *Id*. She discussed the possible complications of such an operation, including loss of mobility, "need for re-operation" and the possibility that it "may not improve her pain." *Id.*

Dr. Warbritton saw Plaintiff for a second agreed medical examination on August 12, 2012. *Id*. at 607. Plaintiff's condition had generally deteriorated since her initial examination in August 2010. *See id*. at 613–14. Dr. Warbritton noted that Plaintiff's gait had worsened and the muscle atrophy in her right thigh and calf had increased. *Id*. Dr. Warbritton opined that "although [he] presumed the surgery was performed in a technically capable manner, the patient exhibited poor result with significant ongoing inflammation and with symptoms suggestive of neuropathic pain in the foot." *Id*. at 615. Dr. Warbritton concluded that Plaintiff's right ankle was forty percent impaired and her whole person was sixteen percent impaired. *Id*. at 618.

In July 2013, Plaintiff was referred to Edward Tang, M.D., a foot and ankle specialist, after Dr. Andersen left her practice. *Id*. at 520. Medical records from Dr. Tang's office are not in the record but Gary Martinovsky, M.D. reviewed and summarized these records in his August 28, 2013 report when he began to provide pain management treatment to Plaintiff. *See id*. at 520–22. According to Dr. Martinovsky, Plaintiff was scheduled for surgery in January 2013; however,

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff postponed the surgery until the summer months because she would otherwise be unable to drive her children during the school year. *Id*. at 521. Dr. Martinovsky states that Dr. Tang had a "very frank conversation" with Plaintiff about her surgical options. *Id*. at 521–22. Dr. Tang explained that Plaintiff was a candidate for two fusion procedures: a subtalar arthrodesis or a triple arthrodesis. *Id*. at 521. Dr. Tang noted that both procedures would likely reduce Plaintiff's pain but worsen Plaintiff's range of motion in her hindfoot and neither would improve her strength or gait. *Id*. at 521–22. Dr. Tang was "somewhat pessimistic" about Plaintiff's outcome because she had been injured since 2009 and Plaintiff's previous non-operative and operative treatments "had failed." *Id*. at 522. In light of Dr. Tang's concerns, Plaintiff decided to "hold[] on any surgical intervention" and to focus primarily on pain management. *Id.* Dr. Tang recommended Plaintiff be referred to a pain management doctor. *Id.* .

In August 2013, Plaintiff began seeing Dr. Martinovsky, a physician at Integrated Pain Care, for pain management. *Id*. at 515. In his initial evaluation, Dr. Martinovsky noted that Plaintiff ambulated with antalgic gait and her right ankle exhibited a decreased range of motion, decreased strength, decreased reflexes, and edema. *Id*. at 522–23. In the "Present Complaints" section of the report, he noted that Plaintiff rated her pain level at 6-7, though her pain level in the past week had averaged at 7-8. *Id.* at 517. He noted that the "pain [was] aggravated by standing and prolonged sitting and walking" and that Plaintiff could walk only one block before having to stop because of pain. *Id.* Dr. Martinovsky prescribed Plaintiff Vicodin, Neurontin, Naproxen, and Prilosec. *Id*. at 523–34. In September 2013, Dr. Martinovsky replaced Plaintiff's Vicodin prescription with prescriptions for Norco and Gabapentin. *Id*. at 551. In December 2013, Plaintiff underwent an EMG which was negative and did not indicate any neuropathy. *Id*. at 545.

Following complaints of severe lower back pain, Plaintiff had an MRI of her lower back in December 2013, which revealed a "disc protrusion that abuts the thecal sac" at the L5-S1 joint and a "[p]osterior annular tear/fissure." *Id*. at 542. Jeanette Amezquita, N.P. diagnosed Plaintiff with "[t]enosynovitis of foot and ankle" and "[d]isplacement of lumbar intervertebral disc without myelopathy." *Id*. Ms. Amezquita noted that Plaintiff's right calf was "notably thinner" than her left calf and requested approval for a lumbar epidural steroid injection to relieve pain in Plaintiff's

United States District Court
Northern District of California

lower back. *Id*. At Plaintiff's January 2014 appointment, Ms. Amezquita requested further approval for physical therapy and stated Plaintiff could not lift or carry any objects over fifteen pounds, could not crouch, crawl, or kneel, and could not stand for more than thirty minutes. *Id*. at 540. Worker's compensation ultimately denied the epidural steroid injection, *id.* at 537, and physical therapy sessions, *id*. at 534. Plaintiff continued to see the providers at the pain management clinic roughly monthly until June 2014. *See id*. at 526–34.

On August 11, 2014, Plaintiff saw Ernest Sponzilli, M.D., an orthopedic specialist, to examine her lower back. *Id*. at 656. Dr. Sponzilli concluded that Plaintiff likely had lumbar disc herniation from L4-5 to L5-S1 with L5 nerve root compression irritation and radicular pain syndrome. *Id*. at 657. Dr. Sponzilli prescribed liver enzymes, Neurontin, physical therapy, and an electromyography; however, it is not apparent from the record whether Plaintiff received these treatments. *See id*. at 654. Following Plaintiff's initial visit, Dr. Sponzilli saw Plaintiff for five follow-up examinations until July 2015. *Id*. at 648–56. Dr. Sponzilli prescribed Plaintiff Vicodin, Norco, and Tramadol. *Id*. at 659–52. Plaintiff had an MRI of her lower back on December 27, 2014, which revealed "a 4.5 mm disc herniation at L5-S1." *Id*. at 652. During her final appointment with Dr. Sponzilli in July 2015, he opined that Plaintiff "would benefit from an L5-S1 epidural, nucloplasty, and discectomy" and noted that Plaintiff was "experiencing significant issues with pain management alone." *Id*. at 648.

On December 12, 2014, Plaintiff had a third agreed medical examination with Dr. Warbritton. *Id*. at 582. Dr. Warbritton observed that Plaintiff ambulated with antalgic gait with a CAM walker boot. *Id*. at 587. Dr. Warbritton opined that it was medically probable that her CAM walker boot was "aggravating her lower back pain." *Id*. After examining Plaintiff's lower back, Dr. Warbritton found "mild diffuse tenderness but no evidence for significant hypersensitivity or symptom magnification." *Id*. Further, Dr. Warbritton found "moderate tenderness on the right and no tenderness on the left" of her sacroiliac joints and tenderness on the right, but not the left, of Plaintiff's sciatic notches. *Id*. Dr. Warbritton measured one-inch atrophy in Plaintiff's right thigh and three-fourths inch atrophy in her right calf. *Id*. at 588. During the time after Plaintiff's first examination with Dr. Warbritton, Plaintiff's right calf and thigh had

1   further atrophied.  *Compare id*. at 588, *with id*. at 632.  Dr. Warbritton concluded that Plaintiff

2   could sit for four hours a day, walk on even ground for four hours a day, stand for four hours a

3   day, never climb or work at heights, carry up to ten pounds constantly, occasionally carry eleven

4   to twenty-five pounds, and never carry more than twenty-five pounds during a workday.  *Id*. at

5   594.

6          On February 9, 2015, Plaintiff saw Robert Larsen, M.D. for an agreed medical psychiatric

7   disability evaluation.  *Id*. at 557.  Dr. Larsen observed Plaintiff exhibit "[s]adness, disappointment,

8   dissatisfaction, low self-esteem, guilt shame, tearfulness, and worry."  *Id*. at 568.  Dr. Larsen

9   diagnosed Plaintiff with depressive disorder not otherwise specified, dependent and avoidant

10  personality traits, chronic pain syndrome status post right ankle ligament reconstruction, moderate

11  psychosocial stressors, and mild approaching moderate emotional symptoms and associated

12  impairment.  *Id*.  Dr. Larsen concluded that "[h]er emotional distress has never been so severe as

13  to render her temporarily totally disabled" and attributed her condition completely to Plaintiff's

14  2009 ankle injury.  *Id*. at 569–70.

15         On January 27, 2016, Plaintiff was examined by consultative examiner Omar Bayne, M.D.,

16  an orthopedic specialist.  *Id*. at 661.  In his orthopedic evaluation, Dr. Bayne diagnosed Plaintiff

17  with chronic recurrent lower back strain, right L5 lumbar radiculopathy, and chronic recurrent

18  right lateral ankle pain.  *Id*. at 663.  Dr. Bayne noted in the "History of Present Illness" section of

19  his report that Plaintiff's "back pain is aggravated with bending, twisting, crouching, crawling or

20  stooping[,]" that her "walking tolerance [was] about three blocks[,]" and that "[h]er standing

21  tolerance was 10-15 minutes."  *Id.* at 661.  Nonetheless, in the "Functionality and

22  Recommendations" section, Dr. Bayne concluded that Plaintiff "should be able to stand and walk

23  with appropriate breaks for four hours" and "sit with appropriate breaks for six hours during an

24  eight-hour workday."  *Id*.  He continued that Plaintiff should be able to occasionally bend, twist,

25  crouch, stoop, climb stairs, and lift twenty pounds and frequently lift ten pounds.  *Id*.

26         **B.    Administrative Hearing**

27         On October 30, 2017, an administrative hearing was held.  Administrative Law Judge

28  ("ALJ") David LaBarre presided.  The ALJ began his examination of Plaintiff by asking her about

United States District Court
Northern District of California

10

her duties when she was most recently employed in 2009. *Id*. at 41. Plaintiff explained that after she injured her ankle, she worked light duty as a lead hotel housekeeper.[3] *Id*. Light duty involved alternating between doing laundry while sitting for thirty to forty minutes, standing up, and taking breaks to elevate and ice her ankle for approximately fifteen minutes. *Id*. at 41–42. Plaintiff testified that she iced her ankle every half an hour while on light duty and still ices her ankle to reduce swelling. *Id*. at 42. She explained that she does the same thing when she is doing her "house chores," taking breaks every thirty minutes to ice her ankle and doing "a little bit" of her chores in-between. *Id.* Plaintiff told the ALJ that she spends her days doing light chores around her house and takes breaks to elevate her leg. *Id.* at 44.

The ALJ next asked Plaintiff whether she is able to work. *Id*. at 43. Plaintiff stated that she is unable to work because she is unable to walk, stand, and sit for long periods. *Id*. Plaintiff testified that she can walk about a half an hour before her ankle becomes swollen and she needs to rest. *Id*. Plaintiff continued that she can stand for thirty-five to forty minutes and can sit forty to forty-five minutes. *Id*. at 44. She testified that with medication she can sit for 50 minutes to an hour before needing to stand up and walk around but that medication does not increase the amount of time she can walk. *Id*. at 50-51. She testified that with medication she could stand about 40 minutes rather than a half hour. *Id*. at 51.

The ALJ then turned to Plaintiff's initial injury and treatments. *Id*. at 45. Plaintiff testified that she first injured her ankle in August 2009 after missing a step while walking down stairs at work and twisting her ankle. *Id*. After her injury, Plaintiff told the ALJ that she was given pain medication and used a cane, CAM boot, and crutches and that she stopped using these assistive devices because Dr. Tang told her these devices worsened her gait and her back. See *id*. at 47–48. The ALJ asked Plaintiff about her ankle surgery and her decision to not undergo a second ankle surgery. *Id*. at 49. Plaintiff explained that she declined the second surgery to fuse her joints because Dr. Tang told her she had a forty to fifty percent chance that her leg would improve and

---

[3] Plaintiff's position as a lead hotel housekeeper involved some supervisory tasks, such as inspecting hotel rooms; however, the role still required significant physical exertion while doing laundry, changing sheets, vacuuming, and moving furniture. AR at 43.

because she would have less movement in her ankle.  *Id*. at 49–50.

The ALJ then sought testimony from Mr. Schmidt, the vocational expert ("VE").  *Id*. at 59. The VE classified Plaintiff's past work as a sales clerk, cleaner, and inspector.  *Id*. at 60.  The ALJ posed the following hypothetical:

> Assume a hypothetical individual of the claimant's age, education and work experience who is able to perform less than full range of light exertion work activities as it is defined in the Regulations with the following specific limitations.  The individual is able to frequently lift and carry ten pounds, occasionally lift and carry 20 pounds, sit for six hours in an eight-hour workday with normal breaks, stand or walk for four hours in an eight-hour workday with normal breaks.  The individual can occasionally climb ladders, ropes or scaffolds, occasionally climb ramps and stairs, frequently stoop, kneel, balance, crouch and crawl and may never work at unprotected heights.

*Id*. at 60–61.  The VE testified that although the hypothetical individual could not perform Plaintiff's past work, such an individual could perform other work.  *Id*. at 61.  In particular, according to the VE such an individual could work as an "[o]rder clerk" (approximately 19,000 jobs), "[a]ssembly" (approximately 33,000 jobs), or a "[l]oader, semi-conductor" (approximately 16,000 jobs).  *Id*.  The ALJ then further limited the hypothetical individual's ability to work as follows:

> Assume a hypothetical individual of the claimant's age, education and work experience who is able to perform sedentary exertion work activities as defined in the Regulations with the following specific limitations.  The individual is able to frequently lift and carry less than five pounds, occasionally lift and carry ten pounds, sit for six hours in an eight-hour workday, stand and walk two hours in an eight-hour workday with normal breaks.  The individual can never climb ladders, ropes or scaffolds.  The individual can occasionally climb ramps and stairs.

*Id*. at 62.  The VE testified that such an individual could not perform Plaintiff's past work but could still perform the other occupations appropriate for the individual in the initial hypothetical. *Id*.  The ALJ then asked whether such an individual could work if the individual could sit for one hour at a time, could stand for forty minutes at a time, and could walk for thirty minutes at a time. *Id*.  The VE stated that such an individual could not perform any work.  *Id*.

The Plaintiff's attorney then asked the VE if the individual in any of the previous hypothetical situations posed could work if such individual needed to elevate their leg after one

United States District Court
Northern District of California

1    hour of sitting.  *Id.* at 63.  The VE replied there would be no suitable work available.  *Id.*

2        **B.    Legal Background: Five-Step Analysis for Determining Physical Disability**

3        Disability insurance benefits are available under the Social Security Act (the "Act") when

4    an eligible claimant is unable "to engage in any substantial gainful activity by reason of any

5    medically determinable physical or mental impairment . . . which has lasted or can be expected to

6    last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42

7    U.S.C. § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of

8    such severity that he is not only unable to do his previous work but also "cannot, considering his

9    age, education, and work experience, engage in any other kind of substantial gainful work which

10   exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

11       The Commissioner has established a sequential, five-part evaluation process to determine

12   whether a claimant is disabled under the Act.  *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir.

13   1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through

14   four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be

15   'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

16   steps." *Id.*

17       At step one, the ALJ considers whether the claimant is presently engaged in "substantial

18   gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is engaged in such activity, the

19   ALJ determines that the claimant is not disabled, and the evaluation process stops.  *Id.*  If the

20   claimant is not engaged in substantial gainful activity, the ALJ continues to step two.  *See id.*

21       At step two, the ALJ considers whether the claimant has "a severe medically determinable

22   physical or mental impairment" or combination of such impairments that meets the regulations'

23   twelve-month durational requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment

24   or combination of impairments is severe if it "significantly limits [the claimant's] physical or

25   mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have

26   a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ

27   determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

28       At step three, the ALJ compares the medical severity of the claimant's impairments to a

United States District Court
Northern District of California

13

list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ must assess the claimant's Residual Function Capacity ("RFC").  An

RFC is "the most [a claimant] can still do despite [that claimant's] limitations ... based on all the

relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then

determines whether, given the claimant's RFC, the claimant would be able to perform his past

relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has

done within the past fifteen years, that was substantial gainful activity, and that lasted long enough

for [the claimant] to learn how to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to

perform his past relevant work, then the ALJ finds that he is not disabled.  If the claimant is unable

to perform his past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in

substantial numbers in the national economy that the claimant can perform despite [the claimant's]

identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.

Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

entitled to benefits if there are not a significant number of jobs available in the national economy

that the claimant can perform.  *Id.*

### C.    The ALJ's Decision

The ALJ found at step one that Plaintiff engaged in substantial gainful activity between her

alleged onset date of March 1, 2010 and her date last insured, December 31, 2014.  AR at 19.  At

step two, he found the following severe impairments:  "reflex sympathetic dystrophy in the right

lower limb; March 2011 status post right ankle ligament surgical repair with sensory

deficits/neuropathy pin of right ankle and foot; tenosynovitis of foot and ankle; degenerative joint

disease (at talonavicular & subtalar joints and neuritis); subtalar impingement/osteoarthropahy

[sic]; and chronic pain syndrome."  AR at 19-20. At step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled a listing. AR at
22. At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work except that
she is able to frequently lift/carry 5 pounds, occasionally lift/carry 10 pounds, sit for up to 6 hours,
stand or walk two hours in an 8-hour workday with "normal" breaks, and can never climb ropes,
ladders or scaffolds. AR at 22. The ALJ further found that Plaintiff is able to occasionally climb
ramps/stairs, frequently stoop, kneel, balance, crouch and crawl, and is limited from working at
unprotected heights. AR 23. The ALJ concluded that Plaintiff was not disabled because with this
RFC she was capable of performing jobs existing in significant numbers in the national economy.
AR 28-29.

### D. Issues for Review

Did the ALJ err in rejecting Plaintiff's statements about the severity, persistence and
limiting effects of her impairments because he did not provide specific, clear and convincing
reasons for doing so? And in particular:

1) was the ALJ's reliance on the medical evidence in the record a specific, clear and
   convincing reason for his conclusion?
2) was the ALJ's reliance on Plaintiff's activities of daily living a specific, clear and
   convincing reason for his conclusion?

## III. ANALYSIS

### A. Legal Standard for Determining Disability

District courts have jurisdiction to review the final decisions of the Commissioner and may
affirm, modify, or reverse the Commissioner's decisions with or without remanding for further
hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). "This court may set aside a denial
of Social Security disability insurance benefits when the [Commissioner's] findings are based on
legal error or are not supported by substantial evidence in the record as a whole." *Desrosiers v.
Sec'y of Health & Human Servs.*, 846 F.2d 573, 575–76 (9th Cir. 1988). Substantial evidence is
"such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is
based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial
evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers*, 846

United States District Court
Northern District of California

F.2d at 576.  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

## B.    Whether the ALJ Provided Adequate Reasons for Failing to Fully Credit Plaintiff's Subjective Symptom and Limitation Testimony

An ALJ is required to engage in a two-step analysis when evaluating a claimant's subjective testimony about the severity of her symptoms.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (internal quotations and citations omitted).  "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Id.* (quoting *Smolen*, 80 F.3d at 1281).  Here, the ALJ found that Plaintiff satisfied the first step of the analysis. AR at 23. Therefore, he was required to provide "specific, clear and convincing reasons" for rejecting Plaintiff's testimony with respect to the severity of her symptoms. The Court concludes that he did not meet that burden.

### 1.    The ALJ's reliance on the medical record was not a sufficient reason to reject Plaintiff's symptom testimony

"[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *see also* 20 C.F.R. § 404.1529(c)(2) (assuring claimants that an ALJ "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). Moreover, "an ALJ does not provide specific, clear, and convincing reasons for rejecting a

United States District Court
Northern District of California

claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Rather, the ALJ must "specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Id.* Finally, "[a]n ALJ may not selectively rely on some entries in the record while ignoring others." *Lacy v. Saul*, No. 19-CV-00140-SI, 2019 WL 4845965, at *8 (N.D. Cal. Oct. 1, 2019) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)). "'In other words, an ALJ cannot cherry-pick evidence to support her findings.'" *Id.* (quoting *Sells v. Comm'r of Soc. Sec. Admin.*, No. CV-16-04330-PHX-JAT, 2017 WL 3167626, at *11 (D. Ariz. July 26, 2017)).

Here, the ALJ's reliance on the medical record was not adequate because he merely summarized the medical record and then reached the following conclusion:

> Thus, while the medical evidence supports a finding that the claimant has "severe" impairments, the objective findings on imaging studies and the course of medical treatment do not support the claimant's allegations of an inability to perform *all* work. Rather, the objective findings of record support a determination that the claimant retains the ability a range of work at the sedentary exertional level.

AR at 26. The ALJ did not, however, provide specific reasons linking Plaintiff's testimony about her limitations to particular medical evidence to support this vague conclusion.

The Court further finds that the ALJ's reliance on the medical record did not constitute a specific, clear and convincing reason for his evaluation of Plaintiff's testimony about her symptoms and limitations because the ALJ cherry-picked and even mischaracterized the evidence in summarizing the record. For example, in describing the medical record with respect to Plaintiff's recovery from her March 2011 ligament reconstruction surgery, the ALJ stated that "[t]he surgery was performed without any complications and follow-up visits between March and July 2011 showed her ankle was healing well, she was getting better and had good ankle stability." AR 24. According to the ALJ, Plaintiff complained only of "mild dull pain" post-operative. *Id.* He goes on to summarize the medical records relating to Plaintiff's recovery from her ligament reconstruction surgery over the ensuing months, noting that in early 2012 there was no "ankle

17

1    instability" and that 13 months post-operative, "in April 2012, there was only mild amount of

2    swelling since the last physical examination and mildly decreased strength diffusely in the right

3    ankle."  *Id.*  The ALJ then states that Dr. Mann" recommended subtalar joint fusion for her pain

4    from the subtalar arthritis."  *Id.*

5          The ALJ's statements about Plaintiff's pain level are not consistent with the medical

6    records, however.  As summarized above, Plaintiff's pain level was consistently described by both

7    Dr. Mann and Dr. Peatman as moderate rather than mild, and sometimes even severe.   The word

8    "mild" was used rarely in these post-operative treatment notes:  Dr. Peatman once used the phrase

9    "mild to moderate" (June 2011 treatment note, AR 445);  and on rare occasion these doctors

10   described Plaintiff's ankle pain as mild but her heel pain as moderate.  *See, e.g.*, AR at 357, 443-

11   444.  But the vast majority of the treatment notes in the year that followed Plaintiff's surgery

12   indicate that Plaintiff consistently reported more than mild pain.  The ALJ's conclusion that

13   Plaintiff complained only of mild pain is inaccurate and not supported by even a scintilla of

14   evidence.

15         Likewise, the ALJ's statement that Plaintiff was "getting better" (the opinion expressed Dr.

16   Peatman for a period of a few months after Plaintiff's surgery) is misleading and does not

17   accurately reflect the record.  The ALJ fails to acknowledge that Dr. Peatman walked that opinion

18   back in the months that followed and that by December 2011 he had changed his mind, opining

19   that Plaintiff was *not* getting better.  In fact, all of the doctors who examined or treated Plaintiff

20   were in agreement that the 2011 reconstruction surgery was a failure.  *See, e.g.*, AR at 349-350

21   (Dr. Mann acknowledging that Plaintiff "did not respond to lateral ligament reconstruction."); 522

22   (Dr. Tang stating that the procedure had "failed");  615 (Dr. Warbritton stating that Plaintiff's

23   surgery had a "poor result").  Nor did the ALJ acknowledge the repeated statements of Plaintiff's

24   doctors in the two years that followed her surgery (cited above) that Plaintiff's ability to walk was

25   extremely limited because of her pain, that her pain was exacerbated by prolonged standing and

26   walking, and that Plaintiff had to ice her ankle several times a day and take between 3 and 6

27

28

United States District Court
Northern District of California

Vicodin to alleviate her pain.[4]

Therefore, the Court finds that the ALJ's reliance on the medical record is not a specific, clear or convincing reason to discount Plaintiff's testimony about her symptoms.

### 2. The ALJ's reliance on Plaintiff's daily activities was not a sufficient reason to reject Plaintiff's symptom testimony

The ALJ's reliance on Plaintiff's reports of her daily activities also is not a specific, clear or convincing reason for discounting her testimony. In assessing whether a claimant's pain testimony should be credited, an ALJ may consider the claimant's daily activities. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014). Thus, "[r]ecognizing that 'disability claimants should not be penalized for

---

[4] At AR 27, the ALJ makes a vague statement that he placed "little weight" on the opinions of the doctors who examined Plaintiff as part of her workers' compensation case that were inconsistent with the ALJ's own conclusions because these examiners "performed limited and intermittent examinations and issued restrictions and limitations appropriate at the time" but "did not have the advantage of reviewing the entire record and did not evaluate the claimant's impairment under the SSA program standards." AR at 27 (citing as examples AR exhibits 1F, 3F, 5F and 8F). This vague statement falls short in numerous respects. First, it is impossible to determine which opinions (or even doctors) the statement refers to, much less understand why the reasons given justified giving weight to the opinions he agreed with while rejecting those that were inconsistent with his conclusions. Further, to the extent that the reasons refer to opinions of Dr. Peatman (whose records are found in Exhibit 3F), the ALJ's reasons are not supported by the record. In particular, the record contains treatment notes from Dr. Peatman that cover almost three years (including two years within the relevant period here) during which Dr. Peatman saw Plaintiff every 4-6 weeks. Moreover, Dr. Peatman's notes are detailed and reflect familiarity with Plaintiff's overall treatment during this period. Nor is it clear why Dr. Peatman's observations should be rejected on the basis that they only reflected Plaintiff's "limitations appropriate at the time." Indeed, Dr. Peatman's regular evaluation of Plaintiff's limitations shed significant light on Plaintiff's ability to work during the relevant period. Finally, the ALJ's vague statement about Social Security standards is supported by no explanation as to why any difference between workers' compensation and Social Security standards would warrant discounting the opinions of Dr. Peatman (or any of the other workers' compensation doctors) about Plaintiff's symptoms and limitations. *See Berry v. Astrue*, 622 F.3d 1228, 1236 (9th Cir. 2010) (holding that the ALJ did not give a "persuasive, specific or valid" reason for discounting finding of disability by the Veteran's Administration by citing generally to the difference between the rules applied by the Veteran's Administration and those applied by the Social Security Administration). Therefore, to the extent the ALJ's rejection of Plaintiff's testimony was based on his weighing of the medical evidence in the record (including discounting the opinions of workers' compensation doctors that did not agree with his own conclusions), that reason was not a specific, clear or convincing reason for discounting Plaintiff's testimony.

attempting to lead normal lives in the face of their limitations,' [the Ninth Circuit has] held that '[o]nly if [her] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [her] credibility'" *Id.* (quoting *Reddick*, 157 F.3d at 722).

Here, the ALJ found that Plaintiff's daily activities supported his conclusion because she was "independent for her basic activities of daily living, does not need help preparing meals, is able to drive but chooses not to, and spends her day doing light chores around the house." *Id.* at 26 (citing AR 252-258 (Adult Function Report); 668 (report of psychiatric examination)).  Yet the ALJ does not explain why these activities are inconsistent with Plaintiff's testimony about her symptoms and her limited ability to sit, stand or walk for prolonged periods.  Furthermore, Plaintiff's responses in the Adult Function Report are consistent with her testimony.  In particular, Plaintiff states that her cooking consisted of sandwiches, cup-o-noodles, and rice, fish and vegetables, and that cooking took her 2-3 hours because she needed to take frequent breaks.  AR at 254.  Likewise, the chores she lists ("make my bed, wash dishes, laundry") are not inconsistent with her testimony that she needs to take frequent breaks and cannot walk, stand or sit for prolonged periods.  *See id.*

Plaintiffs' testimony at the hearing about her daily activities also does not support the ALJ's conclusion.  Plaintiff testified that she does chores around her home like "[c]leaning my bed, sweeping, mopping a little bit, [and] cooking" but that she takes frequent breaks to sit and elevate her leg, and that she continues to ice her ankle during the day.  *Id.*at 42, 44.  She also testified that her children help her with chores and her older children help care for her younger children.  *Id.* at 44–45.  Nor did Plaintiff describe any activities or chores that were inconsistent with her testimony that she takes frequent breaks to elevate her leg while completing them.

In sum, the ALJ's reliance on Plaintiff's activities of daily living was not a specific, clear or convincing reason to discount Plaintiff's testimony and was not supported by substantial evidence.

### E.   Remedy

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted).  "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654

F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and ambiguities." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

The Court finds that it is appropriate to apply the credit-as-true rule here.  First, for the reasons discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony about her pain, including her testimony that she could not walk for more than 30 minutes at a time, stand for more than 40 minutes at a time or sit more than 50 minutes at a time.  Second, at the hearing the VE was specifically asked what work would be available to a hypothetical individual whose limitations matched the ALJ's RFC except that the individual could sit for only one hour at a time, could stand for forty minutes at a time, and could walk for thirty minutes at a time.  AR at 62.  The VE testified that no work would be available to such an individual.  Thus, if Plaintiff's testimony is credited as true, the evidence in the record establishes that she was disabled before her date last insured and further proceedings are not required.  Third, the Court concludes that the record as a whole leaves no doubt as to disability and that no conflicts or ambiguities need be resolved.  Therefore, it is appropriate to award benefits because further administrative proceedings would not be useful.

## II.    CONCLUSION

For the reasons discussed above, Plaintiff's motion is GRANTED, the Commissioner's

motion is DENIED and the decision of the Commissioner is reversed.  This case will be remanded

to the Commissioner for award of benefits.  The Clerk is instructed to enter a judgment

accordingly and to close the file.

     **IT IS SO ORDERED.**

Dated:  September 21, 2020

 

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California